# FERGUSON CONTRACTING CO. *v.* COAL & COKE RAILWAY CO.

### FOREIGN CORPORATIONS; PROCESS.

1. A corporation created and empowered to engage in a particular business or enterprise has the right to transact matters of business incidental to the main object; and it therefore has the power not only to establish offices for the conduct of its chief business, but also for the transaction of any business incidental thereto. (Following *Ricketts v. Sun Printing & Pub. Asso.* 27 App. D. C. 222.)

2. Service of process in this District in an action on an arbitration award, upon the treasurer of the defendant, a West Virginia corporation, whose only corporate business under its charter is that of constructing and operating a railroad lying wholly within that State, and the only business in which it has been engaged since the construction of its railway is the operation of the same there, is sufficient to subject the defendant to the jurisdiction of the court here, under the provision of sec. 1537 D. C. Code [31 Stat. at L. 1419, chap. 854] that, in actions against foreign corporations "doing business" in the District, process may be served on the agent of such corporation or person conducting its business, where it appears, among other things, that the defendant maintains and pays part of the rent of an office in this district, in which are to be found, for the greater part of each year, its president, secretary, and treasurer, who there transact business relating to the corporate purposes, and important to the success of the corporation's industrial operations; that bids for the construction of its road were here opened, considered, and accepted by its managing officers and their assistants; and that the arbitration agreement out of which the suit arose was agreed upon in the office here, and the proceedings thereunder were here conducted; and it is immaterial that the office here is maintained primarily for the convenience of the president and treasurer, who choose, for social purposes, to remain here during the greater portion of the year.

No. 1967.    Submitted February 5, 1909.    Decided April 6, 1909.

HEARING on an appeal by the plaintiff from an order of the Supreme Court of the District of Columbia, vacating and quashing an attempted service of process upon the defendant in an action upon an arbitration award.                    *Reversed.*

The COURT in the opinion stated the facts as follows:

This action was begun by the Ferguson Contracting Company to recover the sum of $96,270.99 with interest, on an award of arbitrators. The declaration alleges that the defendant, the Coal & Coke Railway Company, is a corporation organized and existing under the laws of the State of West Virginia, doing business and having an office for the transaction of business in the District of Columbia; that a controversy having arisen between the plaintiff and defendant relating to certain work and services in and about the construction of a railway in the State of West Virginia, for defendant, and in order to put an end to the controversy plaintiff and defendant, on the 29th day of June, 1906, at the city of Washington, in the District of Columbia, entered into an agreement in writing to submit themselves to the award of three arbitrators. Said agreement, which is attached as an exhibit to the declaration, provided for the submission of all matters of difference between the parties to the said arbitrators, and it was provided that their written award shall be final, conclusive, and binding upon the parties thereto, and a bar to any demand of either party against the other for anything growing out of or based upon the contract aforesaid, etc. That the said arbitrators proceeded in accordance with the terms and conditions of said agreement, and, on the 9th day of September, 1907, made their award between the said plaintiff and the defendant of and concerning the said differences, and awarded that the defendant should pay to the said plaintiff the sum of $96,270.99 in full satisfaction and discharge of the said matter of difference; that said award has not been impeached, and is in full force and effect. That plaintiff has performed all the conditions on its part, and made demand upon the defendant for the payment of the amount of

the said award, which has been refused.   The said award is also attached as an exhibit to the declaration.

Summons was issued on the declaration, February 18, 1908, and was returned by the marshal of the District of Columbia as served on Arthur Lee, treasurer of defendant, on the same day.   On March 12, the defendant entered a special appearance and moved the court to quash and vacate the service of process and the return thereof, upon the ground that the defendant is a foreign corporation, to wit, a corporation organized under the laws of the State of West Virginia, and having its habitat therein, and it is not now and never has been doing business within the District of Columbia, within the intent of the laws in force in said District with respect to the service of process upon foreign corporations therein.

An agreed statement of the facts given in evidence on the hearing of said motion shows that the defendant is a West Virginia corporation, whose only corporate business under its charter is that of constructing and operating a railroad lying wholly within the said State, and the only business in which it has been engaged since the construction of its railway is the operation of the same in West Virginia.   It has at no time constructed or operated any railway in the District of Columbia, or owned any property therein, or sold tickets, received freights, issued bills of lading, or solicited business of any kind or character within the district.   It appears from the affidavits that Mr. H. G. Davis, president, and Mr. Arthur Lee, treasurer of defendant, have been in the habit of spending their winters in Washington from about the middle of October to the middle of May, for a number of years last past, because of the pleasant climate, and because socially agreeable to them and their families; that Charles M. Hendley, secretary of defendant, who is the private secretary of Mr. Davis and for a number of companies of which he is president also, has spent those parts of the year in Washington because Mr. Davis was here, and to help him with his work.   The domicil of Mr. Hendley is in Washington, while that of Davis and Lee is Elkins, West Virginia.   Elkins is not on the line of the C. & C. Railway line; the company has

a trackage right to Elkins from the C. & C. Railway line, seven or eight miles away, and its main offices and headquarters are there.   Besides these officials, the occupants of the Washington office have been a stenographer, and perhaps a clerk, the offices consisting of three rooms on the second floor of the building. They are rented in the name of H. G. Davis, individually, at $50 per month, which is paid the year round, though the offices are closed from May to November.  70 per cent of the rent and expenses is paid by the defendant, 10 per cent by Mr. Davis individually; and the remaining 20 per cent of rent and expenses by other companies of which Mr. Davis is the president. There is no evidence by whom the name of the defendant was placed on the sign board or directory at the entrance to the building; the president was not aware that it was there until his attention was called to it by the affidavits in this suit, though it is shown to have been there as far back as the arbitration proceedings, which occurred in the summer of 1907. The office rooms have not that name displayed upon their doors. The directory of the building shows "Coal & Coke Railway Company, Room 6," and underneath, separated, appears "H. G. Davis, Room 5."

As regards the presence at the office in Washington of records, profiles, specifications, contracts, etc., belonging to defendant, the testimony shows that, in 1904, when certain bids for construction were opened and considered by the president of the defendant for constructing parts of the defendant's lines in West Virginia, the profiles, specifications, and other papers were sent to the Washington office from the headquarters at Elkins, for the purpose of being passed on by the officers of the defendant.   Officers of plaintiff were there as bidders by appointment, as were also a number of other bidders for the work.  In 1906, when an effort was being made at a conference in the Washington office, arranged beforehand, to adjust the differences between the plaintiff and defendant, the officers and agents of both being present by appointment, by attempting to agree upon the amount properly due, the records, profiles, estimate sheets, etc., were in the office in Washington.  As to these papers, the de-

fendant's testimony is to the effect that they were not on file in the Washington office, but were brought there for reference at the time and for the purposes mentioned. With regard to the conducting of correspondence from the office in Washington, the affidavits of defendant show that it was maintained as a place to which correspondence of officers and employees of the several corporations, of which Mr. Davis was president, could be addressed to him, and where he could conveniently answer them, and that letters were written by them upon letter heads containing the name of the defendant, and specifying No. 1517 H street, Northwest, Washington, District of Columbia, as its office; there being no other stationery with the name of the defendant company upon it. The correspondence was confined chiefly to that with subordinates at Elkins, though there were sometimes other letters, and it was conducted from Washington because the officers mentioned were there duing the specified parts of the year. A great number of such letters were written to plaintiff concerning business between plaintiff and defendant. If the officers were at Old Point Comfort, or at Atlantic City, or elsewhere, the letters would be written and signed there. In Washington, current letters and a letter-press book were kept, and copies taken, and the letters and letter-press book were subsequently filed at Elkins with the records there. No letter-press books were kept at Atlantic City or Old Point, and no copies taken there; and no office was maintained at any of such places. Copies of the letters offered in evidence, written from Washington to other than subordinates of the company, show that Lee conducted correspondence on behalf of the Coal & Coke Railway Company from the Washington office when there. Checks could not be paid without his signature as treasurer, and he signed them at the Washington office when he was in Washington. While at Washington, Hendley would do whatever it was necessary for him to do as secretary of the defendant. Very little of the secretary's office work was done in Washington; once in a while someone would write for a map, or for some information about the road. Mr. Davis signed and

dispatched leters on letter heads of the defendant company, dated at the Washington office.

The business transactions in Washington, stated chronologically, are as follows:

1. The defendant purchased the lines of the Charleston, Glendenning, & Sutton Railroad, assuming payment of an indebtedness of the road to the contractors. Lee, as treasurer, sent the contractors a check of defendant company on the bank at Elkins, West Virginia, for the final balance agreed upon. No part of contractors' work was done in the District of Columbia; their conferences with the contractors had been held in West Virginia and Maryland.

2. In 1904 the plaintiff, whose domicil was at Pittsburg, Pennsylvania, and a number of other contractors, were invited to bid upon certain sections of defendant's lines in West Virginia, and plaintiff's engineer was directed by defendant's engineer to send its bid to the general manager at Elkins. The latter informed plaintiff's engineer the letting had been postponed, that the bids would be tabulated and considered in Washington, where plaintiff's engineer and president attended by request of defendant. The contracts were let several weeks thereafter, and plaintiff's witnesses were unable to state where the contracts for this work were let. The bids were opened and considered at the Washington office of the defendant; its president, general manager and chief engineer being present. Defendant's affidavits are that no contracts were at any time made in the District of Columbia, save perhaps for some stationery.

3. Under the contract between the parties to this cause for the construction of defendant's railroad, defendant was entitled to retain a certain percentage of the contract price until final settlement. In 1904, the plaintiff desired that some advances might be made from these retained percentages, although not entitled thereto, and its representatives came to Washington, and had a conference with the treasurer of the defendant company, with a view to being allowed such an advance, which was refused at that time.

4. In 1905, plaintiff's president was told to come to Wash-

ington, where he would be paid $20,000 on account of the re-
tained percentages before due under the contract, which was
then nearly completed. At a conference with defendant's of-
ficers in the Washington office, an arrangement was made by
which defendant loaned plaintiff $20,000, taking its note,
which it sent to the West Virginia bank, and then sent plaintiff
the money. The note and order were drawn in the Washington
office. Defendant had no object in the transaction but to ac-
commodate plaintiff and enable it to raise money. The note was
forwarded to the Trust Company of West Virginia, requesting
it to discount the same, and send the proceeds to plaintiff at
Pittsburg. In doing this, the treasurer, Lee, was acting as an
individual, as a matter of accommodation for the plaintiff.

5. In 1906 considerable correspondence took place between
the presidents of the two companies, and several personal inter-
views were had with a view to a final settlement,—one in Wash-
ington and one in New York before the arbitration. The cor-
respondence of defendant's president was largely from Wash-
ington, with the Washington letter heads. The correspondence,
together with a resulting personal conference in Washington in
March, 1906, resulted in a verbal agreement between them, ar-
rived at in the office at Washington, to submit their differences
to arbitration. The offer to submit was made by defendant's
president in Washington, and accepted by plaintiff at the same
place. At the same time and place, it was agreed that Wash-
ington should be the place of arbitration. At the direction of
defendant's president, the verbal agreement to arbitrate was re-
duced to writing, sent to defendant's attorney at Elkins, West
Virginia, where it was prepared and signed by the defendant,
and subsequently by the plaintiff at Pittsburg. At one of the
conferences in Washington, at which, besides Davis and Lee,
there were present defendant's general manager and engineer,
besides plaintiff's president, engineer, and general manager,
two items of difference were there conceded by the defendant
and were paid, the two items amounting to about $1,500, which
defendant's general manager and president thereupon agreed to
pay, and the same has since been paid.

6. The arbitration proceedings took place in 1907, at the office in Washington, at 1517 H street, and at Deer Park, Maryland. After agreeing to arbitrate in Washington, and part of the proceedings had there been had, a stipulation was entered into by which the arbitrators were authorized to sit at Deer Park, Maryland.

7. With respect to the use made of the office in Washington for defendant's purposes, other than as above stated, the only business done by the treasurer was the signing of checks forwarded to him to Washington for the purpose, when he was there, and which he either then sent directly to their destination, or back to Elkins, to be forwarded from there. They were sometimes sent to the treasurer for his signature at Washington, sometimes to Atlantic City, sometimes to Old Point Comfort. None of them was drawn at Washington, but at Elkins. Checks were required to be signed by the cashier and the treasurer. The entire clerical force of the treasurer's office was at Elkins; the vouchers upon which checks were issued were first approved by the resident engineer, then by the chief engineer, and then by the general manager of the company, all of whom were in West Virginia. They were then sent to the treasurer, whose duty it was to make them bankable or have checks drawn to cover them. When paid they were kept in the files at Elkins. All vouchers of the plaintiff were sent to the treasurer in Washington, when he was here, for settlement. These vouchers consist of a number of estimate sheets and another small voucher. These estimate sheets were first approved by the resident engineer, then by the auditor, both of whom were in West Virginia; then receipted by the plaintiff, certified by the bookkeeper, approved for payment by the general manager, found correct by the auditor, then signed by the manager, the treasurer's part being to furnish funds, out of the general funds, to meet the same. All these officers, except the treasurer, are located in West Virginia. On two occasions defendant discounted paper with the Riggs Bank in Washington, once in the winter, when the president and treasurer were in Washington, and once in the summer, when the treasurer came on for

the purpose of arranging a renewal.  The loan amounted to $30,000.  Note was signed by the defendant and indorsed personally by President Davis.  Attached to this statement is a lot of correspondence on letter heads entitled "Coal and Coke Company, 1517 H street, N. W., Washington, D. C.," followed by the names of the general officers of the company.  One of these letters, of November 13, 1906, addressed to the president of plaintiff company, and signed by Henry G. Davis, president of defendant, has the following: "As I am now occupying my offices in Washington for the winter, it will probably be more convenient for us to have personal interviews, as you are no doubt here from time to time and I am occasionally in New York.  It is quite likely that I shall have to go there early next week, and I write to inquire whether you feel disposed to meet me, to discuss the possibility of the settlement of the differences between the two companies, and thus avoid the further delay and expense of formal arbitration proceedings.  If you should be in Washington in the meantime, I shall, of course, be glad to see you here."

The stipulation regarding the removal of the arbitration hearing, signed by all of the parties, recites that the hearing was begun on the 17th day of June, 1907, at the office of the Coal & Coke Railway, in the city of Washington, by the agreement of both parties to the controversy, their attorneys and said arbitrators.  That the same was continued there until the 29th of June, on which day further hearing was adjourned until the 19th day of August, 1907, at the same place, and that, as it has been deemed advisable to change the place of meeting from Washington to Deer Park, the same is agreed upon, all parties waiving any exception or objection to said change of place of meeting, and waiving all irregularity, if any, arising out of the same.

Upon this testimony, the court, being of opinion that the defendant was not doing business in the city of Washington, sustained the motion to quash and vacate the summons and return thereon.  From that order plaintiff has appealed.

*Mr. James S. Easby-Smith, Mr. H. Ralph Burton,* and *Mr. John G. Carlisle* for the appellant.

*Mr. J. J. Darlington* and *Mr. Charles J. Faulkner* for the appellee.

Chief Justice SHEPARD delivered the opinion of the Court:

The validity of the summons and service to bring the Coal & Coke Railway Company, a corporation of the State of West Virginia, before the supreme court of the District of Columbia, is determinable by the provisions of sec. 1537 of the Code [31 Stat. at L. 1419, chap. 854], which [is amended in 32 Stat. at L. 544, chap. 1329, and] reads as follows:

"Service on Foreign Corporations.—In actions against foreign corporations doing business in the District, all process may be served on the agent of such corporation or person conducting its business, or, in case he is absent and cannot be found, by leaving a copy at the principal place of business in the District, or, if there be no such place of business, by leaving the same at the place of business or residence of such agent in said District; and such service shall be effectual to bring the corporation before the court. When a foreign corporation shall transact business in the District without having any place of business or resident agent therein, service upon any officer or agent of said corporation in the District shall be effectual as to suits growing out of contracts entered into or to be performed, in whole or in part, in the District of Columbia, or growing out of any tort heretofore or hereafter committed in said District."

By act of February, 1907, the last paragraph was amended by inserting the word "employee" after agent, as one upon whom service might be had. 34 Stat. at L. 874, chap. 445.

It is a settled principle of law that the legal residence or habitat of a corporation is in the State under whose laws it shall have been organized. When foreign corporations began to extend their operations into the District of Columbia, doing business or performing acts therein out of which controversies

would naturally arise, sound public policy dictated the provision by statute of the power and means to bring them under the jurisdiction of the District courts, in order to remedy the mischief that would otherwise result from the application of the foregoing principle.

The provision quoted does not undertake to specify what particular acts or transactions shall constitute doing business in the District by a foreign corporation. It is, therefore, a matter for judicial determination.

A corporation is usually created and empowered to engage in some particular business or enterprise, but it necessarily exercises many powers, and transacts many matters of business, incidental to the main object. It has the power, therefore, not only to establish offices for the conduct of its chief business, but also for the transaction of any business incidental thereto. *Re Hohorst,* 150 U. S. 653, 663, 37 L. ed. 1211, 1215, 14 Sup. Ct. Rep. 221; *Ricketts* v. *Sun Printing & Pub. Asso.* 27 App. D. C. 222, 226.

In the first of those cases, the defendant (sued in the State of New York) was a foreign corporation created for the purpose of constructing and operating ships engaged in trade with this country. The principal office was in a foreign country. It owned docks in the State of New Jersey, where its ships were loaded and unloaded, and maintained there an office for the transaction of all business relating to its industrial operations. Kunhardt & Company, who had an office of their own in New York, were the agents of the corporation for its "usual monetary and financial transactions;" the nature of which does not appear in the report of the case. Service of summons upon Kunhardt & Company was held sufficient to bring the corporation before the court in New York.

In *Ricketts* v. *Sun Printing & Pub. Asso. supra,* the defendant corporation was organized to publish the Sun newspaper in the city of New York, but it also engaged in carrying on the business of a press news association. It maintained an office in the city of Washington, where, for convenience, a part of the subordinate business was transacted. This was held to be doing

business in the District of Columbia within the meaning of the statute. We perceive no material distinction between those cases and this. It is true that the industrial operations of the defendant herein were conducted entirely without the limits of the District of Columbia. It sold no tickets therein for the transportation of persons, and entered into no contracts for the carriage of goods. But it did maintain an office in the city of Washington, in which were to be found, for the greater part of each year, its president, secretary, and treasurer, who there transacted business incidentally relating to the corporate purposes, and important to the success of its industrial operations. Bids for the construction of its road were there opened, considered, and accepted by the managing officers and their assistants. The arbitration out of which this action arose was agreed upon in said office, and the proceedings thereunder were there conducted. These, and other matters relating to the corporate business and management, as shown in the testimony hereinbefore recited, were transacted in said office. It is clear that, if the corporation had maintained an agency in the District for the conduct of a part of its regular industrial operations, it would be doing business therein, within the contemplation of the statute, and service of summons upon such subordinate agent would be effectual to bring the corporation before the District courts.

For a stronger reason, we think, the maintenance of an office in the District for the performance by the general officers of their duties of management and supervision of the affairs of the corporation amounts to doing business therein within the meaning of the Code.

That said office was maintained, primarily, for the convenience of the president and treasurer, who chose, for social purposes, to remain in the city of Washington during the greater portion of each year, is, in our opinion, immaterial. Their convenience was made that of the corporation also. Recognizing the fact that business would be transacted in said office in the promotion of its objects, the corporation paid 70 per cent of the office rent.

The substantial transfer of the general corporation management and supervision to that office, though primarily intended for the convenience of the managing officers, was approved by the corporation, and it cannot escape the legal consequences of its acts.

It has been earnestly contended that the foregoing conclusion is in conflict with a recent decision of the Supreme Court of the United States. *Green* v. *Chicago, B. & Q. R. Co.* 205 U. S. 530, 51 L. ed. 916, 27 Sup. Ct. Rep. 595. We perceive no conflict whatever; the facts of the two cases are quite different. The defendant in that case was an Iowa corporation, maintaining a railway in the Northwest, the Eastern terminus of which was the city of Chicago. Plaintiff, a citizen of Pennsylvania, brought an action against it in that State for personal injuries received on defendant's lane in the State of Colorado. Defendant had a district freight and passenger agent in Pennsylvania, for whose use it furnished an office. The agent's business was to solicit passengers and freight for further carriage over its lines in the West. He sold no tickets and received no payments for transportation of freight. It was held that these facts did not amount to doing business in the State of Pennsylvania. The court said: "The business shown in this case was, in substance, nothing more than that of solicitation. Without undertaking to formulate any general rule defining what transactions will constitute 'doing business,' in the sense that liability to service is incurred, we think that this is not enough to bring the defendant within the district so that process can be served upon it." Had the defendant maintained an office in Pennsylvania for its president, secretary, and treasurer, wherein the affairs of the corporation were in great part managed, we believe that the jurisdiction would have been sustained.

This conclusion renders it unnecessary to consider whether the jurisdiction can be maintained upon other clauses of the section.

The order will be reversed, with costs, and the cause remanded for further proceedings.                    *Reversed.*